UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

IPOC INTERNATIONAL GROWTH FUND, LTD., )
                                           )
                                           )
                     Plaintiff, )
                                           )
                                           )
v.                                           )      ___ Civ. ___ (  )
                                           )
LEONID ROZHETSKIN, MIKHAIL FRIDMAN, )   **JURY TRIAL DEMANDED**
PYOTR AVEN, ALFA GROUP CONSORTIUM, )
ALFA CAPITAL MARKETS, INC., ALFA )
TELECOM (n/k/a ALTIMO) and HANS BODMER, )
                                           )
                     Defendants. )
_____

## COMPLAINT

Plaintiff, for its Complaint against Defendants, alleges as follows:

### NATURE OF THE ACTION AND OVERVIEW

1.  Plaintiff brings this action for racketeering, unjust enrichment, conversion and other wrongs committed by the Defendants who conspired with a host of other entities and individuals to perpetrate a vast international scheme to misappropriate millions of dollars from Plaintiff. Victims of Defendants' scheme include IPOC International Growth Fund, Ltd. (Bermuda) ("IPOC") and the United States Treasury—which were all injured by Defendants' criminal activities described further below. Not only is Plaintiff the victim of Defendants' scheme, but so too did the Defendants' tentacles reach into and injure numerous Americans as described further below.

2.  In 2001, Plaintiff IPOC International Growth Fund, Ltd. entered into negotiations with an American, Leonid Rozhetskin, with the idea of investing in a

nascent cellular phone business in Moscow, Russia. Mr. Rozhetskin had been actively searching for investors to obtain funding for a start-up entity known as Sonic Duo.

3. As described further below, over the ensuing years, IPOC spent in excess of $50 million in reasonable reliance on Defendant Rozhetskin's urging to acquire TMI, the holding company of CTM, which in turn held majority control (65%) of Sonic Duo. In 2001, Sonic Duo and other companies combined to form OAO MegaFon, the third largest cellular business in Russia. CTM's stake in Sonic Duo became a 25.1% blocking stake in MegaFon.

4. What was a legitimate business opportunity for IPOC evolved into a vehicle for Rozhetskin's and Mikhail Fridman's theft and misappropriation. Scheming with co-conspirator Fridman and a group of related individuals and entities, the Defendants induced IPOC to pay millions and then misappropriated IPOC's payments and purportedly transferred IPOC's ownership interest to Fridman and his associates.

5. Surreptitiously, Rozhetskin and Fridman schemed whereby Rozhetskin would receive IPOC's cash, while Fridman, through a labyrinth of associated individuals and entities (most of which are located in the Caribbean and offshore), would obtain effective control over Plaintiff's interest in Sonic Duo/MegaFon.

6. Doing so furthered Fridman's goal of taking over a significant portion of the Russian mobile telecommunications industry. Defendant Fridman, as the mastermind, Defendant Alfa Group Consortium, Defendant Alfa Capital Markets Inc. (an American corporation), Defendant Rozhetskin, and other individuals and entities have associated in Fridman's mobile cellular Enterprise (the "Fridman M.C. Enterprise" or

2

"Enterprise"), the purpose of which is to make money from investing in, the operation of, and the diversion of profits from various cellular phone businesses for their own use.

7. As a further part of that scheme, Defendant Fridman has successfully obtained hundreds of millions of dollars from American investors through the sale of interests in his Russian telecommunications empire—which includes New York Stock Exchange company Vimpel-Communications, also known as VimpelCom, and Golden Telecom, Inc. ("Golden Telecom"), a NASDAQ company. VimpelCom is the second largest cellular operator in Russia (and a New York Stock Exchange company) with an eight billion dollar market capitalization. Golden Telecom is a NASDAQ company and files reports regularly with the Securities and Exchange Commission. By obtaining a concentration of telecommunications assets and through his actions against IPOC, Fridman seeks to obtain a near monopoly of the Russian cellular telecommunications industry to further the ability to raise prices for cellular services, and to further the Fridman M.C. Enterprise's goal of making money from investment in cellular telecommunications, the operation of such businesses, and through the diversion of profits for Defendants' own personal benefit.

8. Plaintiff IPOC is a company that would block the Enterprise's way. In light of this, the Fridman M.C. Enterprise conspired with Rozhetskin to attempt to misappropriate IPOC's funds through money laundering, bribery, wire fraud, and other criminal wrongdoing as discussed below. Acquiring capital from IPOC while gaining control of MegaFon, provided the Fridman M.C. Enterprise with both MegaFon and VimpelCom, the second and third largest cellular operators in Russia, and was a further impetus for Defendants' fraud scheme.

3

9. More recently, the Fridman M.C. Enterprise and Defendant Alfa Capital have been embroiled in insider trading in shares of the New York Stock Exchange company VimpelCom. Unlike the American investing public, Alfa Group Consortium and its associates, including Fridman, are VimpelCom insiders. In 2004, these Defendants had inside information concerning VimpelCom's finances and tax situation. The Fridman M.C. Enterprise took full advantage of its insider status, causing VimpelCom to artificially inflate to the investing public the amount of its Russian tax liabilities. Doing so, led to a one day $450 million stampede of investors out of VimpelCom stock and a dramatic $2 billion loss in VimpelCom's market capitalization. On information and belief, Alfa Capital then, through a variety of associates, snapped up the VimpelCom shares at a low price. After Alfa acquired a still larger position in VimpelCom stock in this manner, VimpelCom announced that the tax matters had been resolved for a tiny fraction of the previously reported tax liability that caused the stock to crash. Through this manipulation, Fridman, Alfa Capital and Alfa Group Consortium profited handsomely from the insider trading and furthered the Fridman M.C. Enterprise's goal of obtaining control and consolidation of the telecommunications market in Russia at the expense of other investors, including defrauded American investors. Although the harm resulting from these improper tactics has been significant and demonstrates the criminal misconduct by the Enterprise, this complaint does not rely on this conduct to establish a RICO violation nor does IPOC seek to recover any damages for the actions described in this paragraph.

10. Defendants Alfa Group, Fridman, Aven and Alfa Capital have all been called to task previously for their strong-arm tactics and racketeering in this District.

4

In fact, the Second Circuit Court of Appeals recently reversed a District Court decision which had dismissed RICO claims against these Defendants based upon a RICO conspiracy to defraud Norex, its Canadian partner, of its ownership interest in another company. Discovery is now proceeding in that case.

11.  The United Nations in New York, through former Federal Reserve Board Chairman, Paul Volcker, has named Defendant Alfa Group for criminal wrongdoing and cited its $2.3 million in illegal kickbacks and bribes to Saddam Hussein in the Oil for Food Program.  *See Independent Inquiry Committee into The United Nations Oil-For Food Programme* ("Volcker Report") at 44-46 (Oct. 27, 2005), http://www.iic-offp.org/story27oct05.htm;        http://www.timesonline.co.uk/article/03-1846855,00.html (noting an Alfa payment of $2.3 million).  In light of the Volker report and other activities in this Country, Alfa Group has found it to be in its interest to retain its own politically connected Washington D.C. lobbying firm to protect its interest as discussed further below.

12.  Defendants' pattern of criminal wrongdoing remains varied and ongoing.

JURISDICTION AND VENUE

13.  Jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 18 U.S.C. § 1964(c) because this case arises under the laws of the United States and is based on claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.  This court also has jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

14. Venue is proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because events and transactions have taken place in this District.

PARTIES

15. Plaintiff IPOC is a mutual fund company organized in Bermuda in 2000. IPOC entered into contracts of finance with the option to acquire Sonic Duo/MegaFon as described further below.

16. Defendant Leonid Rozhetskin is a former director and principal shareholder of LV Finance Group Limited ("LVFG"). He is a United States taxpayer and citizen, owns property in the District, and lived in the District for more than a decade. Rozhetskin is an American lawyer, attended law school in New York, was employed by the United States government for 1-2 years, and previously worked for an American law firm. Rozhetskin worked in Russia for a number of years and was featured on the cover of the Russian edition of Forbes with the title: "The Most Dangerous Shark in Our Waters." Separate from his involvement in this scheme, Rozhetskin has also had substantial contact with, and traveled repeatedly to the United States in connection with the acquisition of Stillwater Mining, a Montana based company, between 2001-2005. Rozhetskin resides in the United States and has some involvement in the movie business.

17. Defendant Mikhail Fridman currently serves as Chairman of the Board of Directors of co-conspirator Alfa Bank and as Chairman of the Board of Directors of Defendant Consortium Alfa Group. Fridman further served on the Board of VimpelCom, a NYSE company, and has control over Golden Telecom, a NASDAQ company. Fridman also has had significant contact with the United States having negotiated the recent sale of an interest in his oil business to BP Amoco for $6.75 billion,

and having purchased the United States trading firm owned by American, Marc Rich, the one time commodities baron pardoned by President Clinton with much controversy. Fridman purports to have become a philanthropist in the United States and is a member of the Board of Counsel on Foreign Relations based in New York. Recently, Mikhail Fridman along with Pyotr Aven availed themselves of American courts as a plaintiff in litigation brought in September 2005. Fridman and Aven lost that case on the merits at summary judgment. See OAO Alfa Bank v. Center for Public Integrity, 387 F. Supp. 2d 20 (D.D.C. 2005).

18. Defendant Alfa Group Consortium ("Alfa Group") is an unincorporated association of various affiliated companies controlled by Defendant Fridman. As reported by the *Financial Times*, the European Bank for Reconstruction and Development placed the Alfa Group on its "black list" on the basis of its business practices including fabricating alleged services by offshore companies that are then charged to companies co-owned by third-parties thereby destroying profits and avoiding the need to share profits with Alfa Group's partners. The Alfa Group controls major international corporations that are publicly traded in the United States including VimpelCom (NYSE), Golden Telecom (NASDAQ) and Turkcell (NYSE). It is also the regional manager for a US/OPIC sponsored investment firm called "The Great Circle Fund." The Alfa Group makes use of this United States agency's (OPIC's) support to provide a significant portion of the funding to meet its investment objectives.

19. The Alfa Group conducts such significant and varied business in the United States that it has actually found it to be in its interest to spend millions of dollars courting the American political elite through Washington D.C. based lobbying firm of

Barbour Griffiths and Rogers, LLC which lobbies Congress and others in Washington on its behalf. In addition to using his lobbying firm, Alfa Group has retained Edward Rogers' Washington D.C. based "investigative" firm, Diligence, Inc.—which has criminally misappropriated IPOC information as described further below, and an army of American P.R. (Hill & Knowlton), and other media "experts" to further its varied interests in this country. Having chosen to spend millions of dollars to influence the United States Congress and others, and having received millions of dollars from the American government and private citizens, it should not fairly be heard to complain of being called to task now in an American courtroom.

20. Defendant Alfa Telecom is another Alfa Group entity that is now referred to as Altimo. Altimo is the parent company of three British Virgin Island ("BVI") companies (Avenue, Santel and Janow Properties) that obtained Plaintiff's stock in MegaFon through the criminal wrongdoing described further below.

21. Defendant Pyotr Aven also has been a major participant in the scheme and worked directly with Rozhetskin and Fridman in the misappropriation and theft of IPOC monies. Aven is a director of Golden Telecom, a NASDAQ company, which regularly files with the United States Securities Exchange Commission. He is a controversial figure: As observed by the United States District Court for the District of Columbia, a Russian "corruption task force informed [the government] that Aven was engaged in various misdeeds, including drug trafficking." *See OAO Alfa Bank v. Center for Public Integrity*, Civ. Action No. 00-2208 (JDB), Mem. Op., Sept. 22, 2005 at 11 n.26.

22. Alfa Capital Markets (USA), Inc. ("Alfa Capital Markets") is a member of the Alfa Group and is a corporation organized under the laws of the United States with its principal place of business and office in New York City. Upon information and belief, Alfa Capital Markets was used to structure the laundering of the proceeds of the Fridman M.C. Enterprise for investment in the United States, such as the recent acquisition of Golden Telecom, Inc., a publicly held American company, controlled by the Alfa Group. On information and belief, Alfa Capital Markets' accounts were used to fund the misappropriation of Plaintiff's property.

23. Defendant Hans Bodmer, as described further below, is a former principal of von Meiss Blum and Partners ("vMPB") a Zurich, Switzerland law firm which served as escrow agent. Bodmer assisted Rozhetskin and Fridman with the Sonic Duo/MegaFon theft scheme. As discussed below, Bodmer worked with his co-conspirators to send instructions to IPOC to wire money through banks in New York for the benefit of Defendants. Bodmer is no stranger to criminal prosecution in the United States, having recently pled guilty to the criminal conspiracy to launder money and conspiracy to violate the United States Foreign Corrupt Practices Act in connection with the scheme to bribe foreign leaders (along with Victor Kozeny, who is currently being extradited to New York from the Bahamas). Case No: 1: 05-CR-00518-RCC-ALL (S.D.N.Y.).

24. Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962 (a)-(d).

ENTERPRISE OVERVIEW

25. Defendants Fridman, Alfa Group Consortium, Alfa Capital Markets Inc. (an American corporation), Rozhetskin, Aven, Alfa Telecom and other individuals and entities have formed an association in fact which shared a common purpose in making money from investing in, the operation of, and the diversion of profits from various cellular phone businesses for their own use. Further, the association-in-fact Enterprise functioned as a continuing unit in a manner that provided the vehicle for the commission of their racketeering activity. At times, various other individuals like Defendant Hans Bodmer were associated and conspired with the Fridman M.C. Enterprise.

26. The Fridman M.C. Enterprise has continuity and a structure that is distinct from its racketeering activity. Specifically, Defendant Mikhail Fridman is the Enterprise's leader, founder and mastermind. He exercises control and directs the Enterprise through his position as Chairman of the Board of Directors of co-conspirator Alfa Bank and as Chairman of the Board of Directors of Defendant Alfa Group Consortium. Fridman is at the center of the Enterprise and used associates who worked directly for him and VimpelCom to serve as the front men for a group of companies nearly all formed in the summer of 2003 to steal funds from IPOC while concealing the theft by transferring the shares of MegaFon to Alfa using nine shell companies during a ten day time period.

27. Defendant Rozhetskin not only knowingly agreed to facilitate Fridman, who operated and managed the Enterprise, but also directed the Enterprise's affairs and held a managerial role in the Enterprise. One of methods by which

10

Rozhetskin conducted and participated in the operation of the Enterprise was to act as a point person to obtain additional cellular phone assets. As described more fully below, Rozhetskin played a central role in the portion of the Enterprise that engaged in defrauding IPOC out of its money and certain cellular telecommunications assets.

28. Defendant Hans Bodmer assisted Rozhetskin and Fridman, and Bodmer took direction from Rozhetskin. Bodmer knowingly agreed to facilitate Rozhetskin and Fridman, who operated and managed the Enterprise, in carrying out overt acts including wiring money through New York banks in furtherance of the scheme. Bodmer provided the knowledge and experience to assist the Enterprise in laundering money to expand their telecommunications power as described further below.

<u>Defendants' Scheme to Acquire IPOC's Money and Property</u>

29. From the time that Rozhetskin began pursuing IPOC's investment in 2001 through the present, Defendants have conspired to steal IPOC's property. In 2001, Rozhetskin induced IPOC to enter into an oral understanding and a formal written agreement by which IPOC invested millions to acquire majority ownership of Sonic Duo. Eventually that Sonic Duo stake was converted into—and IPOC acquired 25.1% of MegaFon from Rozhetskin.

<u>IPOC and Rozhetskin Enter into Their First Agreement</u>

30. In the spring of 2001, Rozhetskin approached IPOC about making a huge investment in his new company. Specifically, Sonic Duo was a burgeoning, but still struggling, cellular operator in Moscow. Rozhetskin, who at that point, together with his partners in LVFG owned roughly 30% of Sonic Duo, told IPOC's Representative, Jeffrey Galmond, that he was searching for a partner who would be able to provide the start-up

11

capital that Sonic Duo needed but that Rozhetskin and his investment company, LVFG, could not provide. Without such equity finance, Sonic Duo could not realize the value of its license to provide cellular phone service in the Moscow region and was of no significant value and of no interest to other potential suitors.

31. Jeffrey Galmond, acting on behalf of IPOC, and Rozhetskin entered into a written agreement (hereinafter "the first option agreement") whereby IPOC would fund Sonic Duo with no less than $15,225,000. In return for such funding, IPOC was granted an option to purchase 77.7% of the issued share capital of Sonic Duo's parent, TMI, which through another intermediary, CTM, owned approximately 50.5% of Sonic Duo. TMI in turn was a wholly owned subsidiary of LVFG. The exercise price for the option was $18 million. Rozhetskin, through his company, retained 22.3% of the issued share capital of TMI--corresponding to approximately 7% of Sonic Duo.

32. To protect IPOC against any transfer of these valuable cellular interests and to induce IPOC to transfer its funds, Rozhetskin expressly agreed that he and his company, LVFG, would not:

a)     sell, transfer or otherwise dispose of, or allow the sale, transfer or disposal of, or create or allow the creation of any encumbrance over (i) its share in TMI or (ii) TMI's stake in CTM or (iii) CTM's shares in Sonic Duo;

b)     allow the issue of any shares or equity participation that would have the effect of diluting (i) its shares in TMI or (ii) TMI's stake in CTM or (iii) CTM's shares in Sonic Duo;

c)     allow TMI or CTM to undertake any business other than the making and management of its investment in CTM and Sonic Duo;

d)     allow any major decision to be taken by TMI, CTM or Sonic Duo except in accordance with IPOC's directions;

12

e) allow any change to be made in the Articles of Association of TMI or the charters of CTM or Sonic Duo or to any shareholder arrangements in respect of them save as contemplated therein.

33. As described further below, IPOC relied on these statements and made all required payments under the first option agreement. In many instances and as described below, this involved wiring of money through banks in New York at Defendants' specific insistence to meet contractual requirements. In addition, Rozhetskin made calls from New York City to Galmond seeking payment. Rozhetskin made these calls as part of and in furtherance of the scheme to defraud IPOC out of millions of dollars and IPOC's interest in Sonic Duo. All of these wirings and telephone calls were an integral part of the scheme to defraud IPOC.

### IPOC Makes Another $26 Million Investment

34. After entering into the first option agreement, IPOC made additional multi-million dollar investments in reliance on Rozhetskin's statements and the parties' express agreement. In addition to such shares that IPOC was to receive under the first option agreement with Rozhetskin, IPOC agreed to purchase Rozhetskin's and LVFG's remaining interest in Sonic Duo for $26 million. Due to concerns over the Sonic Duo/MegaFon project, Rozhetskin had decided to cash out of the project and pocket a profit of $26 million from IPOC's funds in the process.

### Events Leading to Second Option Agreement

35. By the fall of 2001, the shareholders of Sonic Duo had agreed to combine its cellular operations with certain cellular operations of Telia AB, Sonera BV and Telecominvest to form what would become MegaFon. However, Sonic Duo experienced a number of significant financial and technical difficulties that threatened Sonic Duo's viability. For example, on November 11, 2001, the Transition Board for the

13

combined "MegaFon" business expressed concerns over a report that Sonic Duo had failed to reach the development stage that was a condition of it obtaining debt financing under various lenders' credit facilities. This Transition Board consisted of representatives of LVFG as well as Telia AB, Sonera BV and OAO Telecominvest (Russia). The latter three companies were to contribute shares of cellular operators located throughout Russia, which when combined with Sonic Duo's operations in Moscow would be able to create a pan-Russian cellular operator. At that point in time, Sonic Duo, however, was the weak link and was putting the project to create a national operator in jeopardy.

36. This led to a subsequent meeting with Telia AB, at which its representative, Annika Christiansson, expressed concern regarding Sonic Duo's lack of progress, including the failure to launch the network, to meet the Moscow license conditions, and to reach important milestones in its business plan. Christiansson threatened to terminate the MegaFon business combination agreement and abort the merger, leaving the future of Sonic Duo uncertain.

37. As a result of these concerns, LVFG decided to exit the project by selling its remaining interest in TMI, CTM and Sonic Duo to IPOC pursuant to a second option agreement dated December 14, 2001.

38. Under the express terms of the second option agreement, IPOC was granted an option to purchase LVFG's retained 22.3% shareholding in TMI with the underlying interests of CTM and Sonic Duo intact.

39. The stipulated option price for that stock was $26 million, made up of:

      (i)     $7 million in cash to be paid by 21 December 2001;

      (ii)    $3 million in cash to be paid by 28 February 2002;

14

(iii)    A promissory note in the sum of $16 million payable to a designated account of Defendant Hans Bodmer's firm, von Meiss Blum, to be held by them until payment of such sum in accordance with the terms of the promissory note by 1 September 2003.

40. Under the second option agreement, Rozhetskin expressly reaffirmed the above-stated covenants contained in the first option agreement. Rozhetskin made these statements while intentionally scheming to induce IPOC to transfer funds to his control. Rozhetskin made these representations as part of the scheme to defraud IPOC out of money and any interest in Sonic Duo. Unlike the first option agreement, under which IPOC was to provide start-up capital for Sonic Duo, the second option agreement was to result in IPOC paying funds directly to the owners of LVFG to purchase LVFG's remaining interest in TMI/CTM/Sonic Duo. Nevertheless, as a result of the second option agreement, IPOC was left with the risk of funding TMI/CTM's portion of Sonic Duo's further capital requirements, whatever they might be, completely on its own. After the second option agreement, LVFG no longer retained any obligations to fund Sonic Duo.

41. On or about March 2002, Sonic Duo was effectively merged into and became a part of MegaFon, and its value increased accordingly.

Payments by IPOC

42. Induced by and in reliance on Rozhetskin's representations, IPOC made all payments as required; indeed at Rozhetskin's request IPOC made an additional discretionary payment. Unbeknownst to IPOC, Defendant Rozhetskin joined by Defendants Fridman, Bodmer and the other Alfa Defendants used the United States as an integral part of the theft scheme and stole IPOC's money. Defendants' conduct has had a

15

substantial effect on the United States and its citizens, and Defendants' criminal conduct occurred in the United States.

43. Indeed, on April 10, 2001, defendant Bodmer faxed to IPOC in Bermuda a funding call notice with wire transfer instructions. On April 11, 2001, IPOC wired $5,065,000 from its bank in Bermuda to Barclays Bank in New York for further transfer to the Credit Suisse First Boston account of Rozhetskin.

44. On August 8, 2001, Defendant Bodmer faxed another funding call notice with wire instructions to IPOC. On August 16, 2001, through Defendants Bodmer's and Rozhetskin's insistence and by making use of the wires, $6,500,000 was wired from IPOC's bank in Bermuda to Barclays Bank in New York for further transfer to the Credit Suisse First Boston account of Rozhetskin.

45. In or about early November 2001, Rozhetskin telephoned IPOC from New York and demanded an additional $11,387,000 under the first option agreement. At that time, Rozhetskin then faxed a demand to IPOC providing that such monies be sent through "Chase Manhattan Bank, New York, USA" Using a number of intermediaries and at Rozhetskin's requirement, such money was wired from IPOC's account in Bermuda through Barclays Bank in New York and Chase Manhattan to Rozhetskin and his designees in November 2001.

46. On December 14, 2001, Defendant Bodmer sent a request for payment pursuant to the second option agreement to IPOC in Bermuda. Payment under this December 14, 2001 notice was made by IPOC in part through the United States banking system. For example, on December 20, 2001, IPOC wired from its account in Bermuda through Barclays Bank in New York $800,000 to Rozhetskin and his designees.

Second, on December 21, 2001, IPOC through intermediaries, wired another $3,130,000 to Rozhetskin and his designees at the same account at Credit Swisse (First Boston). Third, on December 20, 2001, IPOC through intermediaries wired an additional $3,070,000 to Rozhetskin and his designees through the Bank of New York located at One Wall Street in New York to Credit Swisse (First Boston). Finally, at Bodmer's instruction, on February 26, 2002, IPOC wired to Rozhetskin and his designees through Barclay's Bank in New York the sum of $3,000,000.

47. On August 6, 2002, Defendant Bodmer faxed another notice with wire instructions to IPOC in Bermuda. On August 7, 2002, Defendant Bodmer again sent IPOC instructions that the money be wired through Chase Manhattan Bank in New York and then on to Hyposwiss Private Bank. This notice was in relation to IPOC having previously arranged for certain third parties to make loans to CTM in December 2001. The lenders suggested that the loans be extended. The funding amount of $2,182,610 was paid by IPOC pursuant to these instructions.

48. Plaintiff IPOC made all such payments and others through the United States without knowledge that Defendants Rozhetskin, Bodmer, Fridman, Alfa Group, Alfa Capital and Alfa Telecom were all conspiring whereby Rozhetskin, using the American banks as a vehicle for the fraud scheme, would obtain IPOC's cash, while Fridman through a labyrinth of associates and individuals would obtain effective control over Plaintiffs' interest in Sonic Duo/MegaFon.

### Rozhetskin's Attempts To Get Even More Money From IPOC

49. Having realized that MegaFon would become a success, on December 23, 2002, Rozhetskin demanded from IPOC's Representative, Jeff Galmond, an

17

additional payment of $60 - $70 million for the MegaFon stake, despite the pre-existing contract. Galmond refused to do so.

### The Fraudulent Caribbean Transfer

50. Despite IPOC's contracts, Rozhetskin transferred 49.9% of his stake in CTM which held Sonic Duo/MegaFon stock to three Panamanian companies: Investment Partners I S.A., LV Investment Partners II S.A. and LV Investment Partners III S.A. These companies were controlled by the Fridman M.C. Enterprise either then or shortly thereafter.

51. The December 2002 transfers took place without IPOC's knowledge and contrary to Rozhetskin's agreements with IPOC.

52. IPOC's interest in the Sonic Duo/MegaFon stock was worth millions of dollars when Rozhetskin, through the Fridman M.C. Enterprise, took control of the stolen assets and caused them to be transferred and concealed from IPOC. Rozhetskin knew the assets were unlawfully taken when he made use of the United States to transfer the assets in interstate commerce. Further, Rozhetskin's actions were in furtherance of his goal of cheating the American government of taxes due and owing on the transactions.

### Defendants Enlist Hans Bodmer to Engage in Additional Fraudulent Acts

53. As noted above, Defendant Hans Bodmer of von Meiss Blum & Partners served as the designated escrow agent in connection with the IPOC/Rozhetskin agreements and customarily sent instructions that IPOC should wire monies to Rozhetskin through various accounts controlled by Defendants in New York. Bodmer is

18

a convicted money launderer in the Southern District of New York.  As such, he was susceptible to Defendants' fraud scheme and experienced in money laundering.

54. In March 2003, IPOC wrote Defendant Bodmer concerning the account to which the final $16 million payment should be paid pursuant to the second option agreement.

55. Bodmer responded providing the details of the designated account.

56. Under the December Agreement, an additional payment was due by September 1, 2003.  On July 28, 2003, IPOC wrote to Rozhetskin and his company, LVFG, sending a copy to Bodmer and giving notice that it had paid $16 million to the designated bank account.  Payment was received into the designated account on July 29, 2003, but pursuant to Bodmer's and the Defendants' instructions the LVFG/Rozhetskin account was closed, and the $16 million returned to IPOC's bank account on July 30, 2003.

57. On July 29, 2003, Bodmer also wrote IPOC stating that he and his firm were resigning as escrow agent with the intent and purpose of frustrating IPOC's ability to make the last and final $16 million payment.  Nevertheless, IPOC tendered again the $16 million through another account of von Meiss Blum & Partners where it remained at relevant times before litigation.

58. Bodmer knowingly agreed to participate in the conduct of the M.C. Fridman Enterprise and together with Fridman and Rozhetskin carried out overt acts in furtherance of the Sonic Duo/MegaFon Theft Scheme.  Bodmer provided the knowledge and experience to assist the Enterprise in laundering money and wire fraud.  Through

Bodmer's agreement to participate in his co-Defendant's efforts to steal IPOC's money and take its property, Bodmer became liable as a co-conspirator.

Additional Transfers to the Fridman M.C. Enterprise

59. Shortly after Rozhetskin's movement of IPOC's assets to the three Panamanian companies, between December 2002 and April 2003, Rozhetskin with Fridman, Alfa Group Consortium, Alfa Capital, Alfa Telecom, and Hans Bodmer, schemed to complete the transfer of Rozhetskin and LVFG's interest in Sonic Duo/MegaFon to the Fridman M.C. Enterprise. Part of this interest included the property stolen from IPOC through Rozhetskin's wire fraud and money laundering activities.

60. Each of the Defendants was aware of IPOC's rights under the option agreements and knew that assets were stolen through Rozhetskin's, Bodmer's and other co-conspirators' activity. Nevertheless, Defendants schemed to engage in additional financial transactions that involved the proceeds of their unlawful activity. Defendants conspired to steal IPOC's money and property, and to conceal their wrongdoing and the true ownership of the proceeds through a series of sham transactions and transfer the stolen assets in interstate and foreign commerce with the intent of carrying on and furthering their unlawful activity. By doing so, Defendants engaged in money laundering and wire fraud that affected interstate and foreign commerce. The actions, combined with the actions described elsewhere herein, also constitute RICO predicate acts in violation of the Interstate Transportation of Stolen Goods, 18 U.S.C. § 2314 and the Sale and Receipt of Stolen Property, 18 U.S.C. § 2315, the Laundering of Monetary Instruments, 18 U.S.C. § 1956, and Engaging in Monetary Transactions In Property Derived From Specified Unlawful Activity, 18 U.S.C. § 1957.

20

61. Their actions included assisting Rozhetskin in an international money laundering scheme by which Rozhetskin, using the United States banking systems as an integral part of his theft scheme, took the proceeds of his criminal conduct, and then transferred them to various off-shore companies as part of an attempt to conceal wrongdoing from IPOC, American taxing authorities, and others.   By doing so, Defendants' conduct has had a substantial effect on the United States and its citizens, and much of the criminal conduct occurred in the United States.

62. The Alfa Group, Fridman and other Defendants agreed to enter into the above stated criminal conspiracy and by doing so:

     (i)     sought to increase immediately its share of the Russian telecommunications market;

     (ii)    to use the MegaFon stake and its existing blocking equity stake in VimpelCom to pursue a merger between MegaFon and VimpelCom; and

     (iii)   sought to increase its profits from the operation of mobile telecommunication properties, through its investment in such business, and from the diversion of profits from these entities for Defendants' own use.

63. Fridman, the Alfa Group, Rozhetskin, Bodmer, and other Defendants created a complex web of companies and transactions in a bald attempt to steal IPOC's funds and conceal their theft.   The effect of this daisy chain of companies and transactions was to transfer assets to the Alfa Group while also improperly retaining IPOC's funds. The co-conspirators went to great lengths to conceal their wrongdoing and the proceeds derived from their earlier mail and wire fraud activity, using nine different companies to "buy" and "sell" Rozhetskin's stake--all in ten days (July 21, 2003 through August 1, 2003). Through these money laundering transactions, Fridman, the Alfa Group and/or Alfa Telecom purportedly gained control of the MegaFon stake that Plaintiff had

paid Rozhetskin millions of dollars to acquire.  (See summary chart attached hereto and incorporated as Exhibit A which accurately sets forth the chain of events).

64.  By purporting to transfer Rozhetskin's/LVFG's stake using nine shell companies, Defendants essentially concede their knowledge that their conduct was wrongful and that their conduct needed to be concealed.  As described herein, these actions constitute wire fraud, money laundering, and the predicate acts of Interstate Transportation of Stolen Goods, 18 U.S.C. § 2314, the Sale and Receipt of Stolen Property, 18 U.S.C. § 2315, Laundering of Monetary Instruments, 18 U.S.C. § 1956, and Engaging in Monetary Transactions In Property Derived From Specified Unlawful Activity, 18 U.S.C. § 1957.

65.  Despite Defendants' concealments, investment bankers at Brunswick UBS have confirmed learning that the Alfa Group and Rozhetskin entered into this agreement in the Spring of 2003.

66.  Defendants entered into this transaction in part because Fridman assured Rozhetskin that he has sufficient strength to withstand the consequences of this known to be unlawful conduct.

### Rozhetskin's Tax Fraud and Injury to American Government

67.  Rozhetskin's activity not only defrauded IPOC, but also the United States Government.

68.  Rozhetskin created LVFG as a British Virgin Islands company that owned his interest in Sonic Duo among other assets.

69.  LVFG was controlled by and was, for all intents and purposes, Rozhetskin's alter ego.

22

70. Although Rozhetskin claimed to have sold LVFG and its 25% stake in MegaFon for hundreds of millions of dollars, he defrauded the United States of tax monies. He failed to pay taxes on monies received from IPOC and from Fridman and his shell companies as part of their money laundering/fraud scheme. Defendant Rozhetskin did so while relying upon New York banks to launder the theft of Plaintiff's money.

71. Defendant Rozhetskin was aided by co-Defendants who participated in a variety of sham transactions using holding companies to collectively assist Rozhetskin in his tax fraud against the United States. Further, defendants participated in various financial transactions designed in whole or in part to conceal the nature, the source, the ownership and/or the control of the proceeds of unlawful activity and/or to avoid reporting requirements under Federal law within the meaning of 18 U.S.C. §§ 1956 and 1957 of the Criminal Code.

Defendants' Bribery and Fraud to Conceal Their Criminal Wrongdoing

72. As part of the Defendants' continuing efforts to conceal their fraud and take IPOC's property, they have further engaged in bribery, theft and obstruction of justice. Specifically, a former IPOC employee, Sharma, has been paid in excess of $1 million to present false and fraudulent evidence in other official legal proceedings. Sharma was fired on October 31, 2003 by IPOC, and has been criminally bribed by the Fridman M.C. Enterprise to submit perjurious testimony from 2003 through the present. Fridman, acting through the Fridman M.C. Enterprise, has directed funds, used intimidation and threats, and has attempted to persuade others, including Sharma, with the intent to influence the testimony in official proceedings. All told, the Fridman M.C. Enterprise has spent more than $11 million buying and bribing witnesses.

23

73. Defendants have also paid U.S.-based Diligence, Inc. to steal IPOC property in Bermuda. Indeed, at the Fridman M.C. Enterprise's direction, Diligence bribed officials of an accounting firm and/or otherwise misappropriated IPOC property. More specifically, Diligence, Inc. describes itself on its web site and in its press releases as a company comprised of former Central Intelligence Agency ("C.I.A.") and British MI5 operatives that "specialize in obtaining non-public or hard-to-get information on corporations." See www.diligencecorp.com. Diligence, Inc. is owned in part by Edward Rogers who has also been paid millions by Defendants to lobby Congress and consult for Alfa.

74. In violation of 18 U.S.C. § 912 and at Defendant Alfa's instructions, Diligence, Inc. posed as United States Agents acting under the authority of the United States to misappropriate IPOC information from an accounting firm. Defendants further violated 18 U.S.C. § 913 by searching IPOC property while falsely representing, through Diligence, Inc., to be agents of the United States. By doing so, Defendants have had an effect on the United States. Violation of these statutes carry a three year prison term for each violation.

75. Defendant Alfa Group's agent, Diligence, Inc., engaged in criminal and "fraudulent activity," including making use of wires, to steal and misappropriate IPOC property. Such conduct was authorized and paid by Diligence's ultimate principal, Alfa. Through such payment and wrongful conduct, Defendants engaged in additional acts of wire fraud and money laundering in that they engaged in various financial transactions making use of the wires within the United States and internationally with the

24

intent to promote unlawful activity and to conceal wrongdoing within the meaning of 18 U.S.C. §§ 1956 and 1957.

76. These payments for crimes by Fridman and the Alfa Group demonstrate further continued criminal conduct.

## Additional Threats of Continuing Criminal Conduct by Defendants

77. Defendants Fridman, Aven, the Alfa Group, Alfa Capital, and Alfa Telecom have participated in other racketeering activities which also represent an on-going threat of continued criminal wrongdoing.

78. Indeed, just in this District, the Canadian company Norex alleged that the Alfa Group engaged in a complex scheme to defraud and take the property of Norex through a similarly intricate pattern of transactions. Norex has brought suit in this District citing Defendants' violations of wire fraud statutes, interstate and foreign travel in aid of a racketeering enterprise, laundering of monetary instruments, and money laundering.

79. In the Norex scheme, the Alfa Defendants including Fridman, have been charged with issuing invoices for fabricated services that were purportedly performed by various off-shore shell companies. By creating such expenses, the Alfa Defendants siphon off monies for their own personal benefit and thereby avoid sharing profits with Norex and other third-party shareholders.

80. The United States Court of Appeals for the Second Circuit recently held that the Norex case was properly brought in this District. The Norex matter is further evidence of the continuing nature of criminal wrongdoing by Fridman and the Alfa Defendants.

81. One of the most recent examples of Defendants' continued illegal activity involves the improper bribery of several Ukrainian officials.  According to published news accounts, Ukrainian New Technology, an Alfa affiliate and owned in part by an American publicly traded company, improperly influenced several members of a Ukrainian communications company to gain an unfair advantage in the cellular communications market.  Specifically, Defendants, through Ukrainian New Technology, improperly paid or promised to pay monies to Ukrainian officials to obtain the 3.5GHz frequency that was already in use by a state company and another private company. Through this bribe, the Alfa affiliate secured the 3.5GHz frequency without competitive bid and for 2.6 million Hryvnia less than the market value.  This conduct of the Ukrainian offices is being investigated under article 364 of the Ukrainian Criminal Code for Misuse of Authority or Office, and violates the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1.

82. As noted above, Fridman and the Alfa Group have a controlling stake in VimpelCom, a New York Stock Exchange Company, with eight billion dollars of market capitalization.  As controlling insiders of VimpelCom, Fridman and the Alfa Group knew of a Russian tax inquiry into VimpelCom concerning 2001 and subsequent tax years.  They were also well aware of how the market would respond to negative news of a Russian tax inquiry into VimpelCom.  Indeed, throughout late 2004, the market for Russian stocks was tremendously influenced by news that the Russian tax authorities were auctioning the $10 billion subsidiary of another unrelated Russian company, Yukos, to satisfy tax obligations.  This eventually led to an unprecedented bankruptcy filing by Yukos in the United States.

26

83. On December 8, 2004, VimpelCom shocked the stock market by disclosing that Russian tax authorities were now investigating the company, and that the preliminary finding for 2001 alone was that VimpelCom owed an additional $157 million in taxes, plus potential heavy fines and penalties—the same type of initial disclosure that Yukos made before later filing for bankruptcy protection.

84. The results were dramatic.   On December 8, investors sold approximately $450 million of Vimpelcom stock and its market capitalization declined by approximately $2 billion.   Over the ensuing days, investors sold millions more of VimpelCom stock as its price plummeted.

85. Fridman and the Alfa Group, as insiders, knew that VimpelCom's tax problems were not as serious as publicly stated.   On information and belief, they purchased millions of VimpelCom shares during the weeks following the December 8th announcement.

86. On December 30, 2004, VimpelCom issued a press release disclosing that the 2001 tax issue had been finally resolved for a fifteenth of the amount disclosed on December 8th.   On February 18, 2005, VimpelCom disclosed resolution of the 2002 tax audit -- with its stock price returning to almost the same price as it was on December 7, 2004.

87. Through its market manipulation and conduct, the Alfa Group, Fridman and Alfa Capital have demonstrated their propensity to commit criminal wrongs in this District such that it is not unfair that they should be called to account in this District for their conduct against IPOC.   Although the conduct is also relevant to demonstrate an on-going and widespread pattern of racketeering, this complaint does not

rely on this conduct to establish any predicate act and does not base any claim for damages on this market manipulation.

88. Finally, and as noted in paragraph 11 above, the Alfa Group has also participated in criminal wrongdoing as it relates to its support for Saddam Hussein in the Food For Oil Program.

89. In sum, Defendants have engaged in criminal conduct in violation of Wire Fraud, 18 U.S.C. §§ 1341, 1343, Interstate Transportation of Stolen Goods, 18 U.S.C. § 2314, Sale and Receipt of Stolen Property, 18 U.S.C. § 2315, Laundering of Monetary Instruments, 18 U.S.C. § 1956, and Engaging in Monetary Transactions In Property Derived From Specified Unlawful Activity, 18 U.S.C. § 1957, for their personal profit and to further their financial goals. Plaintiff IPOC has been injured by Defendants' criminal conduct and brings racketeering claims as set forth below.

## COUNT I

### RICO Section 1962(c)

90. Plaintiffs incorporate paragraphs 1 through 89 above by reference.

91. Count I seeks relief from all named defendants for violation of 18 U.S.C. § 1962(c).

92. Each Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

93. At all times relevant to this complaint, each Defendant is a person as used in 18 U.S.C. §§ 1961(3) and 1962(a)-(d).

94. At all times relevant to this Complaint, Mikhail Fridman, Leonid Rozhetskin, Alfa Group Consortium, Alfa Capital Markets, Inc., Alfa Telecom, Hans

Bodmer, and numerous other known and unknown persons are an association-in-fact enterprise as defined by 18 U.S.C. § 1961(4) (the "Fridman M.C. Enterprise"), that was engaged in, and its activities affected, interstate and foreign commerce.

95. The Fridman M.C. Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a)-(c).

96. Defendants, including Rozhetskin, Fridman Alfa Group Consortium, Alfa Capital Markets, Inc., Alfa Telecom, Hans Bodmer and others, agreed to and did conduct and participate in the conduct of the Fridman M.C. Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C §§ 1961(1)& (5), and 1962(c)&(d) and for the unlawful purpose of misappropriating funds, theft, money laundering and concealing cash.

97. Further, Defendants engaged in, and otherwise caused, countless financial transactions and transfers to and from financial institutions in the United States, including New York, Bermuda, the British Virgin Islands, and elsewhere, which transactions violated 18 U.S.C. §§ 1956-57 (money laundering).

98. Defendants concealed their activity by means which violated several provisions of the federal criminal code, including the prohibition on obstructing justice, and the nature, location, source, ownership and control of specific unlawful activity within the meaning of the 18 U.S.C. §§ 1956 (a)(1) & 1956 (a)(2).

99. Defendants conducted this racketeering activity through a pattern of related and continuous predicate acts that began sometime in 2001 and continued through the present. The predicate acts had the purpose of diverting and misappropriating monies paid by Plaintiff and others and to transfer control to the Alfa Defendants.

100.    Further, Defendants' misappropriation repeatedly involved the diversion of funds for: (a) one or more of the Defendants' personal benefit; (b) use in other businesses controlled by one or more defendants; and/or (c) making payments to Rozhetskin and other co-conspirators in order to conceal their theft from IPOC.

101.    Defendants and their co-conspirators committed acts of money laundering, namely financial transactions, to promote their unlawful misappropriation or embezzlement of IPOC's funds in violation of 18 U.S.C. § 1956 (a)(1)(A), and to conceal their unlawful activity in violation of 18 U.S.C. § 1956 (a)(1)(B).

102.    Defendants and their co-conspirators further engaged in similar transactions that involved the transportation of monetary instruments: (a) from a place in the United States to or through a place outside of the United States; and/or (b) to a place in the United States from or through a place outside of the United States, in violation of 18 U.S.C. § 1956 (a)(2). With knowledge that the monies had been misappropriated, and in order to conceal their activities, Defendants and their co-conspirators transported monies back and forth between the United States, Bermuda, the British Virgin Islands and elsewhere.

103.    In most cases, the financial transactions described above involved criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity in violation of 18 U.S.C. § 1957 and/or the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5311, et seq.

104.    Defendants and their co-conspirators caused the use of the wires in furtherance of this misappropriation scheme. In some instances, Defendants personally caused the use of the wires when sending documents relating to option payments. At

30

other times, Defendants committed acts with the knowledge that the use of the wires would follow in the ordinary course of business or where such use could be reasonably foreseen. The wires were used in furtherance of the scheme because they were used to transfer option payments from IPOC, but which in actuality, were part of a theft scheme, or were part of the effort to conceal their scheme through the use of various shell companies as described above.

105.    Such acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). The illegal scheme was effected by a pattern of related acts of actual or attempted Wire Fraud, 18 U.S.C. § 1343, Interstate Transportation of Stolen Goods, 18 U.S.C. § 2314, the Sale and Receipt of Stolen Property, 18 U.S.C. § 2315, the Laundering of Monetary Instruments, 18 U.S.C. § 1956, and Engaging in Monetary Transactions In Property Derived From Specified Unlawful Activity, 18 U.S.C. § 1957, which were agreed upon and coordinated among the Defendants.

106.    Defendants have directly and indirectly conducted and participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) as described above.

107.    The Fridman M.C. Enterprise schemed to steal IPOC's money. As described above, the Fridman M.C. Enterprise carried out this scheme and prevented Plaintiff from recovering its own funds through a series of sham transactions. By engaging in these sham transactions the Fridman M.C. Enterprise is able to make its theft appear legitimate, which, in turn, enables the Enterprise to sustain itself. The concealment of the theft has injured Plaintiff.

108.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c) IPOC has been injured in its business and property.

109.    IPOC has sustained injury to its business or property in the form of (1) stolen funds, (2) expenses incurred, such as attorneys' fees, administrative expenses, and other litigation-related costs, in investigating and attempting to recover its rightful property, and (3) lost profits and diminution in the value of the business as a result of Defendants' conspiracy to improperly obtain control of Plaintiff's funds.

## COUNT II

### RICO Section 1962(d)

110.    Plaintiff incorporates paragraphs 1 through 109 above by reference.

111.    Count II seeks relief from all named Defendants for violation of 18 U.S.C. § 1962(d).

112.    Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

113.    At all times relevant to this complaint, each Defendant is a person as used in 18 U.S.C. §§ 1961(3) and 1962(a)-(d).

114.    At all times relevant to this Complaint, Mikhail Fridman, Leonid Rozhetskin, Alfa Group Consortium, Alfa Capital Markets, Inc., Alfa Telecom, Hans Bodmer, and numerous other known and unknown persons are an association-in-fact enterprise defined by 18 U.S.C. § 1961(4) (the "Fridman M.C. Enterprise"), that was engaged in, and its activities affected, interstate and foreign commerce.

115.    The Fridman M.C. Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a)-(c).

116.    Each of the Defendants knowingly participated in the formation of the scheme with one or more Defendants and willingly participated in the scheme by knowingly and intelligently carrying out the predicate acts detailed herein.

117.    Defendants, including Rozhetskin, Fridman and others, agreed to and did conduct and participate in the conduct of the Fridman M.C. Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally misappropriating funds, theft, money laundering and concealing cash.

118.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).  Specifically, the illegal scheme was effected by a pattern of related acts of actual or attempted Wire Fraud, 18 U.S.C. § 1343, Interstate Transportation of Stolen Goods, 18 U.S.C. § 2314, the Sale and Receipt of Stolen Property, 18 U.S.C. § 2315, the Laundering of Monetary instruments, 18 U.S.C. § 1956, and Engaging in Monetary Transactions In Property Derived From Specified Unlawful Activity, 18 U.S.C. § 1957, which were agreed upon and coordinated among the Defendants.

119.    The Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity (18 U.S.C. § 1962(c)) as described herein.

120.    The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the

schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

121. Specifically, the Fridman M.C. Enterprise schemed to steal IPOC's money. As described above the Fridman M.C. Enterprise carried out this scheme and prevented Plaintiff from recovering his own funds through a series of sham transactions. By engaging in these sham transactions the Fridman M.C. Enterprise is able to make its theft appear legitimate, which, in turn, enables the Enterprise to sustain itself. The concealment of the theft has injured Plaintiff.

122. As a direct and proximate result of the Defendants' conspiracy to commit racketeering activities, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in its business and property.

123. IPOC has sustained injury to its business or property in the form of (1) stolen funds, (2) expenses incurred, such as attorneys' fees, administrative expenses, and other litigation-related costs, in investigating and attempting to recover its rightful property, and (3) lost profits and diminution in the value of the business as a result of the Defendants' conspiracy to improperly obtain control of Plaintiff's funds.

124. IPOC has been directly injured by the overt acts committed in furtherance of the conspiracy.

## COUNT III

## Unjust Enrichment

125. Plaintiff incorporates paragraphs 1 through 124 above by reference.

126.   IPOC performed the services required of it in good faith by paying millions of dollars to Rozhetskin and others at all relevant times as described above.

127.   With the exception of the final $16 million payment by IPOC, the Defendants, including Rozhetskin, accepted millions of dollars from IPOC when it tendered payment.

128.   IPOC had an expectation of compensation of shares of MegaFon stock and other valuable consideration, or, alternatively, the return of its funds.

129.   Such compensation was the reasonable value of the services IPOC tendered.

## COUNT IV

### Quantum Meruit

130.   Plaintiff incorporates paragraphs 1 through 129 above by reference.

131.   IPOC performed the services required of it in good faith by paying millions of dollars to Rozhetskin and others at all relevant times as described above.

132.   With the exception of the final $16 million payment by IPOC, the Defendants, including Rozhetskin, accepted millions of dollars from IPOC when it tendered payment.

133.   IPOC had an expectation of compensation of shares of MegaFon stock and other valuable consideration, or, alternatively, the return of its funds.

134.   Such compensation was the reasonable value of the services IPOC tendered.

35

## COUNT V

### Conversion

135.     Plaintiff incorporates paragraphs 1 through 129 above by reference.

136.     IPOC tendered several payments to Defendants as described above, which totaled in excess of $50 million.

137.     Defendants have retained these funds without transferring the assets contemplated by the parties.

138.     IPOC rightfully owns and has the right to possess the over $50 million dollars that is in the unauthorized possession of the Defendants.

139.     The Defendants have acted to exclude IPOC of the return of its monies.

WHEREFORE, Plaintiff IPOC requests that this Court enter judgment against the Defendant(s) as follows:

a)     An award of its actual damages, including prejudgment interest, trebled pursuant to 18 U.S.C. § 1964--for IPOC, the value of IPOC monies obtained by Defendants ($ 150 million or such additional and further damages as the evidence may so demonstrate);

b)     A return of all property stolen by Defendants;

c)     An award of equitable relief, including but not limited to, the establishment of a constructive trust over all wrongfully retained property;

d)     An award of full reimbursement of its costs and expenses relating to this action, including reasonable attorneys' fees, as provided in 18 U.S.C. § 1964; and

e)     Such further relief, including punitive damages, as the Court deems appropriate and the law provides.

36

Dated: New York, New York
      June 8, 2006

WINSTON & STRAWN LLP

By: _____
David E. Mollón (DEM-5624)
Nikolai Krylov (NK-_____)
200 Park Avenue
New York, NY 10166
(212) 294-6700
dmollon@winston.com

*Attorneys for Plaintiff IPOC*
*International Growth Fund, Ltd.*

Of Counsel:

W. Gordon Dobie
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
wdobie@winston.com

37

Exhibit A

**Scheme moving MegaFon stake from LVFG to Alfa Group**

